**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**THERMO-PLY, INC.,**
a Florida Corporation,

      Plaintiff,                      Case No. 8:05-cv-00779-EAK-MAP

v.

**THE OHIO WILLOW WOOD COMPANY,**
an Ohio corporation;
**SILIPOS, INC.,**
a Delaware corporation;
**SOUTHERN PROSTHETIC SUPPLY, INC.,**
a Georgia corporation;
**HANGER PROSTHETICS & ORTHOTICS, INC.,**
a Delaware corporation; and
**SEATTLE SYSTEMS, INC.**
a California corporation,

      Defendants.
_____/

**PLAINTIFF, THERMO-PLY, INC.'S MOTION IN LIMINE TO EXCLUDE**
**DAVID BROOKSTEIN AS AN EXPERT WITNESS AND TESTIMONY**

      Plaintiff, Thermo-Ply, Inc. ("Thermo-Ply") moves the Court on the following grounds to exclude the expert reports of David Brookstein ("Dr. Brookstein"), as well as any testimony, argument or evidence relating to same, at trial:

      1.      Defendant, The Ohio Willow Wood Company ("OWW") designated Dr. Brooksein as an expert witness under Rule 26(a)(2), Federal Rules of Civil Procedure.

      2.      Dr. Brookstein's proposed expert testimony is not admissible and should not be admitted at trial for two separate reasons. First, his reports and opinions preceded and conflict with the Court's claim construction ruling. Despite the significant passage of

time since this Court's claim construction ruling, Dr. Brookstein never amended any of his opinions to conform to this Court's claim construction rulings, nor did OWW seek leave for him to do so.

3.  Second, Dr. Brookstein's opinions fail to satisfy the any of the standards for admitting expert testimony under Rule 702, Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  He is simply not qualified, his opinions are irrelevant, the tests upon which his opinions are based are not recognized or reliable, and his testimony would not aid the trier of fact.

4.  Consequently, no evidentiary or legal basis exists for admitting Dr. Brookstein's opinions or testimony at trial.

WHEREFORE, Plaintiff, Thermo-Ply, Inc. respectfully requests the Court grant this Motion, exclude Dr. Brookstein's expert reports, as well as any testimony, argument, or evidence relating to his testimony, and grant such other and further relief this Court deems just and appropriate.

## MEMORANDUM OF LAW

In accordance with Rule 3.01(a), Rules of the U.S. District Court for the Middle District of Florida, Thermo-Ply submits this, its supporting memorandum of law.

This Court previously acknowledged that the claims of U.S. Patent No. 6,231,617 (the "'617 Patent") are easy to understand and encompass simple technology. *See* Transcript of June 7, 2007 hearing, at p. 11, line 24 through p. 12, line 1.  The '617 Patent claims as an invention, a prosthetic liner with longitudinal (vertical) inelasticity. Amputees use prosthetic liners as a cushioning interface between a residual limb and a

rigid prosthetic socket. Although radial expansion, or expansion of the liner's circumference, is necessary in order to don the liner and accommodate the residual limb's day-to-day changes, longitudinal expansion (stretching of the liner's length) is not necessary or desirable. Rather, longitudinal stretching of a prosthetic liner can cause the prosthesis to "piston" on the amputee's residual limb while walking, causing discomfort, instability, and irritation. Thermo-Ply's invention disclosed in its '617 Patent solved the longstanding problem of prosthesis pistoning by creating a liner with inhibited longitudinal stretching.

Following the *Markman* hearing, the Court construed certain terms and phrases of the '617 Patent, including the phrase found in Claims 1, 9, and 17 that recites:

> said elongate arms being formed of a predetermined material that is substantially nonstretchable in an axial direction.

The Court construed that phrase to mean "a material (or composite of materials bonded together) chosen in advance that exhibits ***very little longitudinal stretch*** [when attached][1] to the claimed prosthetic liner and ***used for its intended purpose***." *See* Order Adopting Report and Recommendation[2], Dkt. No. 120, at pp. 4-5, and Report and Recommendation[3], Dkt. No. 82, at p. 8 (emphasis added). The Court expressly acknowledged it was adopting the ordinary meaning of the claim terms, and overruled OWW's objection to this simple construction. *See* Order at p. 5.

---

[1] The language in brackets was part of the language proposed by Thermo-Ply and appears to have been inadvertently omitted from the Order.

[2] Hereinafter, referred to and cited as "Order."

[3] Hereinafter, referred to and cited as "R&R."

3

Despite the Court's clear and ready grasp of the '617 Patent's technology and application of the ordinary meaning of the words of the Patent, OWW hired Dr. Brookstein as an "expert" to opine on *whether the fabric component of the elongate arms*, or straps, on OWW's infringing liners is substantially non-stretchable. Although Dr. Brookstein was hired as an expert witness and prepared two expert reports *before* the *Markman* Order issued, OWW failed to tender or even ask to tender a revised expert report before the close of expert discovery. Thus, it is anticipated that OWW will seek to introduce Dr. Brookstein's expert reports and/or his testimony at trial. As set forth below, however, Dr. Brooksteins' opinions and testimony, however, are simply not admissible under controlling law.

## I.  LEGAL AUTHORITY

Although an obvious proposition, it bears stating that expert testimony is inadmissible if conflicts with or it fails to follow the court's claim construction rulings. *See, Medism Ltd. v. BestMed LLC,* 861 F.Supp.2d 158, 171 (S.D.N.Y. 2012); *Martec, LLC v. Johnson & Johnson*, 2010 WL 680490, *4 (S.D. Ill. Feb. 23, 2010); *SPX Corp. v. Bartec USA, LLC,* 2008 WL 3850770, *11 (E.D. Mich. Aug. 12, 2008).

Moreover, because an expert's testimony can be "powerful and quite misleading", the District Court performs a "*critical* 'gatekeeping' function" in determining whether or not to permit such evidence at trial. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)(emphasis added). Courts must undertake an "'*exacting* analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id*. (emphasis added and in original).

To determine the admissibility of expert testimony, the Court conducts a "rigorous" three prong inquiry and considers whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address;
(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and
(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id*.

The burden to establish qualification, reliability, and helpfulness rests on OWW.  *Id*.

## II.    ARGUMENT

Dr. Brookstein's opinions conflict with this Court's claim construction rulings and do not meet *any* of the requirements for admissible expert testimony.

### A.    Dr. Brookstein's Opinions Conflict with and Fail to Follow This Court's Claim Construction Ruling.

Dr. Brookstein's opinions preceded and simply conflict with this Court's claim construction rulings.  Although Dr. Brookstein's opinions purportedly relate to "**stretchability**," neither of his two reports nor any of his opinions address the issue of stretchability in the context of this Court's *Markman* ruling.  That is, whether the elongate arms of OWW's infringing prosthetic liners "a material (or composite of materials bonded together) chosen in advance that exhibits *very little longitudinal stretch* [when attached] to the claimed prosthetic liner and *used for its intended purpose*."  (Emphasis added).

5

Rather, in Dr. Brookstein's First Report, his opinion focuses exclusively on only the "*stretchability*" of the fabric component of the elongate arms *in isolation from the arms when made a part of the prosthetic liner*. May 2007 Dep. Trans. at p. 56, lines 3-16 (emphasis added). Thus, the scope of Dr. Brookstein's opinion suffers from two defects: (1) it fails to evaluate whether the materials exhibit "very little stretch"; and (2) fails to evaluate the amount of stretch when the claimed linter is "used for its intended purpose."

Dr. Brookstein's own deposition testimony establishes that these defects are fatal to the admissibility of his opinions in this case. First, none of Dr. Brookstein's opinions pertain to whether the elongate arms of OWW's infringing liners exhibit "v*ery little longitudinal stretch*"—this Court's claim construction language. Dr. Brookstein admits he has *no opinion* on this issue. May 2007 Dep. Trans. at p. 56, lines 14-16. Rather, Dr. Brookstein opines on whether ***any*** *longitudinal stretch* occurs. "Any" is simply not the same as "very little."

Moreover, Dr. Brookstein's definition of "stretchable" is vastly different from the Court's interpretation of "substantially nonstrechable." In interpreting the phrase "substantially non-stretchable," the Court used the ordinary meaning of "substantial" as "implying 'approximate,' rather than 'perfect' …. [l]ike other words of approximation ('generally,' 'about,' 'almost,' and 'essentially'), they are "descriptive terms 'commonly used in patent claims *to avoid a strict numerical boundary to the specified parameters*." R&R, Dkt. No. 82, at p. 7 (emphasis added). Contrasted against the Court's ordinary meaning construction, Dr. Brookstein's tendered opinion is based on his

> definition of something being stretchable is that the stress/strain curve, the slope of the stress/strain curve, increases as a function of strain. So that you have a relatively low resistance to deformation or a relatively low slope of the curve, and that becomes an increasing slope as [one] go[es] farther and farther along the parameter of stretch or deformation.

Feb. 2007 Dep. Trans. at p. 75, lines 11-19.[4]

Dr. Brookstein's failure to evaluate whether OWW's infringing liners exhibit "v*ery little longitudinal stretch*" and his definition of "stretchability" also violate the principle that each claim term must be afforded meaning. Dr. Brookstein's opinion impermissibly ignores the word "substantially." Dr. Brookstein clearly testified that "anything that's nonstretchable is substantially nonstretchable." February 2007 Dep. Trans. at p. 167, lines 11-13. He further opined that, to him, "substantially nonstretchable" and nonstretchable are "one and the same." February 2007, Dep. Trans. at p. 167, lines 11-16.

Second, Dr. Brookstein's opinions fail to consider the stretch of OWW's infringing liners as they are "*used for [their] intended purpose."* In discussing his first expert report, Dr. Brookstein admitted that the stretchability of the knitted fabrics comprising the elongate strips would be affected when adhered, sewn, or fastened to the liner. May 2007 Dep. Trans. at p. 56, lines 17-23. Dr. Brookstein admitted that if the knitted fabric was adhered to gel, that too, would affect the stretchability of the fabric. May 2007 Dep. Trans. at p. 56, line 24 – p. 57, line 5. Dr. Brookstein, however, had absolutely no opinion on what the stretchability would be under those circumstances –

---

[4] Importantly, Dr. Brookstein never testified, and his expert report does not state, that anyone in the prosthetic industry uses a "stress/strain curve" to determine the amount of stretch in a prosthetic liner.

the very conditions in which the elongate arms of OWW's liners exist and under which they are "*used for [their] intended purpose.*"

Although Dr. Brookstein's Second Report focuses on the "stretchability" of OWW's entire infringing liner (not the elongate arms), his opinions fail to evaluate the stretch while the liner is being "*used for its intended purpose*." This failure in his opinions is not surprising. Dr. Brookstein admitted that he "*does not know at all* how [liners] are used." Transcript of February 15, 2008 deposition of David Brookstein[5] at p. 137, lines 17-19 (emphasis added). Likewise, he has "*no idea* how an amputee wears a liner." February 2008 Dep. Trans. at p. 138, lines 4-5 (emphasis added). Dr. Brookstein confirmed that the opinion in his Second Report, that the "material stretched," was based on the *entire liner*, and *not* the "elongate arms being formed of a predetermined material." February 2008 Dep. Trans. at p. 26, lines 3-14. Dr. Brookstein was interested in "[t]he total extension of the liner," and not the arms themselves. Feb. 2008 Dep. Trans. at p. 38, lines 15-1. Simply put, Dr. Brookstein's opinions wholly missed the point.

### B. Dr. Brookstein is Admittedly Not Qualified to Testify Competently in the Relevant Field of Prosthetics.

Naming Dr. Brookstein as an "expert" in this case is stretching it.[6] Dr. Brookstein admittedly lacks any knowledge, skill, experience, training, or education, whatsoever, in

---

[5] Hereinafter referred to and cited as "Feb. 2008 Dep. Trans. at p. __, line __." All cited excerpts are contained in the February 15, 2008 transcript of the deposition of David Brookstein attached hereto as Exhibit "C."

[6] Pun intended.

8

the field of prosthetics. Transcript of February 9, 2007 deposition of David Brookstein[7] at p. 120, line 21 – p. 121, line 6; Transcript of May 2, 2007 deposition of David Brookstein[8] at p. 137, line 4- p. 138, line 8; p. 165, lines 4-7. Dr. Brookstein also admits he is not an expert in the field of prosthetic liners or any other prosthetic device. May 2007 Dep. Trans. at p. 144, lines 8-13. In fact, Dr. Brookstein "*does not know at all* how [liners] are used….[he] do[es]n't know prosthetics." Transcript of February 15, 2008 deposition of David Brookstein at p. 137, lines 17-19 (emphasis added). He has "*no idea* how an amputee wears a liner." February 2008 Dep. Trans. at p. 138, lines 4-5 (emphasis added).

As discussed further below, expert testimony is not required for the fact finder to determine if the elongate straps of OWW's infringing liners "exhibit very little longitudinal stretch to the claimed prosthetic liner when used for its intended purpose." This question is simply not the type of fact issue that requires "expert" testimony.

Even if such expert testimony would be helpful to the trier of fact, Dr. Brookstein simply is not that expert. An expert witness would need the knowledge, experience, or education of someone in the field of *prosthetics* who could opine whether the materials comprising the elongate arms "stretch very little" in the context of a prosthetic liner—in

---

[7] Hereinafter referred to and cited as "Feb. 2007 Dep. Trans. at p. __, line __." All cited excerpts are contained in the February 9, 2007 transcript of the deposition of David Brookstein attached hereto as Exhibit "A."

[8] Hereinafter referred to and cited as "May 2007 Dep. Trans. at p. __, line __." All cited excerpts are contained in the May 2, 2007 transcript of the deposition of David Brookstein attached hereto as Exhibit "B."

9

other words, "*used for its intended purpose*."  Dr. Brookstein cannot offer and has not offered such an opinion.

> **C.     Dr. Brookstein's Opinions Are Irrelevant Because He Misunderstood what "Predetermined Material" Meant in the '617 Patent.**

Dr. Brookstein simply misunderstood what the term "predetermined material" means as it is used in the '617 Patent.  He thought that term referred to the knit fabric only and *not* the knit strap as sewn to the liner and adhered to the gel on the liner.  May 2007 Dep. Trans. at p. 129, line 14- p. 130, line 1; p. 130, lines 3-10.  Dr. Brookstein, therefore, tested only the knit fabric and not the combination of the knit fabric, knit strap, and gel.  This error renders his opinions, reports, and testimony meaningless.

Once again, Dr. Brookstein's misunderstanding is based on his utter ignorance in the field of prothetics.  Dr. Brookstein made it clear that in his opinions he is "not talking about this as a prosthetic liner.  I'm talking about *fabrics* and their stretchability. . . . I'm representing myself as a fabric performance expert.  That's the . . . only area I'm talking about in this case."  May 2007 Dep. Trans. at p. 148, lines 2-9 (emphasis added).

Dr. Brookstein's knowledge, experience, or education in the field of fabrics, however, is wholly irrelevant to the issues in this case.  As Dr. Brookstein acknowledged, the fabric he examined is *but one* component of the material comprising the elongate arms of OWW's infringing liners.  February 2007 Dep. Trans. at p. 22, line 24 – p. 23, line 2.  The "elongate arms in [OWW's] liner has more than just the fabric…. [t]here's a backing to it, which I never investigated what that was."  February 2007 Dep. Trans. at p.

22, lines 15-16, 18-18. Dr. Brookstein did not know what the other material forms the elongate arms of OWW's infringing liners. February 2007 Dep. Trans. at p. 23, line 3-5.

### D. The Testing Methodologies Underlying Dr. Brookstein's Opinions Are NOT Reliable or Recognized.

Even if Dr. Brookstein was qualified to offer an expert opinion in this case, the Court cannot simply accept his opinion at face value. *U.S. v. Frazier*, 387 F.3d at 1261. The Court must inquire into the reliability of his opinion and ensure that it has a "reliable foundation." This inquiry also dooms Dr. Brookstein's proffered opinion.

To assess the reliability of a proffered expert opinion, courts consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94, 113 S.Ct. 2786, 2796-97 (1993).

Dr. Brookstein could not even identify the "methodologies" for the tests upon which he supposedly based his opinions. Dr. Brookstein's utter ignorance about the methodologies underlying his opinions is not surprising—those tests were not developed or performed by him. Rather, they were developed and performed by the accused infringer--OWW. There is no evidence that OWW's testing methodologies are generally accepted in the relevant field of prosthetics, Dr. Brookstein's field of fabrics, or any other field for that matter. Dr. Brookstein himself could not testify that any test underlying his two expert reports were generally accepted in *any* field.

11

Dr. Brookstein's blind reliance upon tests designed and conducted by the infringer OWW resulted in a comedy of errors. Dr. Brookstein's first expert report expressly stated that his opinion was based upon, among other things, his interpretation of *OWW's reports* of a force/elongation test that it purportedly performed in accordance with the *500 gram Elongation Test Method*. *See* First Expert Report, dated May 19, 2006, at pp. 6, 10[9]. Dr. Brookstein contradicted his own report at his deposition when he admitted that *OWW could not have used the 500 gram Elongation Test Method* to perform its tests and that his First Expert Report was, therefore, "*inaccurate.*" Feb. 2007 Dep. Trans. at p. 78, lines 16-24; p. 79, lines 115-16 (emphasis added).

Not content to merely contradict his own report, Dr. Brookstein also testified that he "had never heard of the 500-gram test" prior to his visit to OWW and "never done anything like that." Apparently unwilling to question anything OWW told him, Dr. Brookstein did not question OWW when they told him they used the "500-gram elongation test" method. February 2007 Dep. Trans. at p. 80, line 22- p. 81, line 8; p. 90, line 18- p. 91, line 2; p. 91, lines 9-11.

Things then got worse. Despite explicitly identifying the "500-gram elongation test" in his expert report, Dr. Brookstein later testified he *believed* OWW used the ASTM Standard D 2594 test protocol, *but did not know* for sure. February 2007 Dep. Trans. at p. 78, lines 16-19; p. 79 lines 15-20; p. 83, lines 4-6. Dr. Brookstein did not, however, know whether the 500-gram elongation test that OWW told him it used would yield a different result than the ASTM test that he believed OWW used. February 2007 Dep.

---

[9] Hereinafter, referred to and cited as "First Report." A true and accurate copy of Dr. Brookstein's First Report dated May 19, 2006 is attached hereto as Exhibit "D."

12

Trans. at p. 90, line 18-p. 91, line 2. Tellingly, Dr. Brookstein then testified that he was "more comfortable" with the ASTM test than with OWW's 500-gram the elongation test. February 2007 Dep. Trans. at p. 80, lines 11-17.

After swearing under oath he was "more comfortable" with the ASTM testing method that he ***thought*** OWW used, Dr. Brookstein changed his mind *yet again.* With regard to the testing protocol that OWW designed and used, Dr. Brookstein testified at a later deposition:

> You know, I don't think – last night I was looking at something. I think that ASTM – what tab is that? I went back and I looked at that last night, and *I'm thinking now that they did **not** do it based on the ASTM method.* They did it based on a method that's actually more common. I don't recall what the number is.

May 2007 Dep. Trans. at p. 110, lines 17-24 (emphasis added). In sum, Dr. Brookstein did not even know *what* testing methodology OWW used and his opinions in the First Expert Report are hardly "reliable."

Dr. Brookstein's opinions in his second expert report[10] are no more reliable than his First Report and similarly lack a good foundation. Dr. Brookstein readily admitted to a *complete* lack of familiarity with OWW's testing methodology—the very tests that supposedly underlie his opinions. Dr. Brookstein neither suggested the methodology nor conducted the tests—rather, OWW did. Feb. 2008 Dep. Trans. at p. 36, lines 7-10; p. 46, lines 21-24. OWW's testing method did *not* follow any industry standard testing of which Dr. Brookstein was aware. Feb. 2008 Dep. Trans. at p. 164, lines 21-24. Dr.

---

[10] Hereinafter, referred to and cited as "Second Expert Report." A true and accurate copy of the Dr. Brookstein's Second Expert Report dated October 15, 2007 is attached hereto as Exhibit "E."

Brookstein merely *believed* that they were standard tests used by OWW, but did not know for sure. Feb. 2008 Dep. Trans. at p. 36, lines 3-4; p. 38, lines 6-14.

It is simply unknown whether the tests performed by OWW and relied upon by Dr. Brookstein are recognized within the prosthetics field. Dr. Brookstein was "not familiar" with *any* testing methods recognized in the prosthetic field, and did not know whether OWW's tests followed standardized testing in the prosthetic liner industry. Feb. 2008 Dep. Trans. at p. 164, lines 10-11; p. 165, line 22- p. 166, line 5.

Because OWW's so-called "expert" does not recognize *any* of the tests underlying his opinions (assuming that he even knows what testing was done), let alone recognize them as acceptable in the prosthetic field, his opinions are unreliable and inadmissible.

### E.  Dr. Brookstein's Testimony Will Not Assist The Trier of Fact

Dr. Brookstein's opinions also fail to meet the third requirement for admissibility--helpfulness. "By this requirement, expert testimony is admissible if it concerns matters that are *beyond* the understanding of the average lay person." *U.S. v. Frazier,* 387 F.3d at 1262 (emphasis added).

The topic of Dr. Brookstein's opinions, whether the knit fabric component of the elongate arms is "stretchable," is certainly not beyond the jury's understanding. If the stretachability of the fabric component alone was relevant – which it is not – the average lay person could certainly make a determination simply by pulling on the fabric. That is, after all, exactly what Dr. Brookstein did to replicate OWW's testing at his deposition: "I

was pulling on it to show that it stretches." February 15, 2008 Depo. Trans. at p. 148, line 22 – p.149, line 11; p. 154, lines 1-5.

Finally, Dr. Brookstein's opinions are not helpful because he simply does not believe that *anything* is "substantially non-stretchable" or "non-stretchable." Instead, he believes that "[e]*verything* is stretchable." May 2007 Dep. Trans., at p. 74, lines 6-7 (emphasis added). Dr. Brookstein even considers a knit Kevlar fabric or a knitted steel fabric to be "stretchy." May 2007 Dep. Trans. at p. 72, lines 16-18; p. 73, lines 15-17. Diamonds, too, stretch according to Dr. Brookstein. May 2007 Dep. Trans. at p. 66, line 19. It is difficult to conceive how this type of opinion could possibly assist the jury in discharging their duty in determining whether the elongate arms of the accused devices are "substantially nonstretchable" in the context of prosthetic liners.

### F.     Nothing Will Change Dr. Brookstein's Opinions

No reason exists to permit Dr. Brookstein to render yet another opinion. According to Dr. Brookstein, "*nothing*" would change his opinions in his First Expert Report and his Second Expert Report, including the Court's claim construction ruling. May 2007 Dep. Trans. at p. 124, lines 7-12; February 2008, Dep. Trans. at p. 43, lines 5-9. The Court should take him at his word and preclude him from amending his opinions.

### CONCLUSION

For all the forgoing reasons, the Court should exercise its critical gatekeeping function to preclude Dr. Brookstein from presenting any expert testimony at the trial of this case.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and accurate copy of the foregoing was electronically filed with the Court on this 17th day of January, 2014.  Notice of this filing will be automatically sent by the Court's CM/ECF system to:  **Michael Gay, Esq.**, mgay@foley.com, Foley & Lardner, LLP, 111 N. Orange Avenue, Suite 1800, P.O. Box 2193, Orlando, Florida 3282-2193; **Benjamin H. Hill, III, Esq.**, bhill@hwlaw.com, **William C. Guerrant, Jr., Esq.**, wguerrant@hwhlaw.com, **Patrick J. Risch, Esq.** prisch@hwhlaw.com, Hill Ward Henderson, 101 E. Kennedy Blvd, Suite 3700, P.O. Box 2231, Tampa, Florida 33601-2231; and **Jeffrey S. Standley, Esq.,** jstandley@standleyllp.com, **James L. Kwak, Esq.,** jkwak@standleyllp.com, **F. Michael Speed, Esq.**, mspeed@standleyllp.com, **Michael R. Stonebrook, Esq.,** mstonebrook@standleyllp.com, Standley Law Group LLP, 6300 Riverside Drive, Dublin, Ohio 43017.

 s/ Richard E. Fee
Richard E. Fee, Esq.
Florida Bar No. 813680
Kathleen M. Wade, Esq.
Florida Bar No. 127965
FEE & JEFFRIES, P.A.
1227 North Franklin Street
Tampa, Florida  33602
(813) 229-8008
(813) 229-0046 (Facsimile)
rfee@feejeffries.com
kwade@feejeffries.com

Trial Counsel for Plaintiff,
Thermo-Ply, Inc.